MELISSA HOLYOAK, United States Attorney (#9832)
CARL D. LESUEUR, Assistant United States Attorney (#16087)
BRENT L. ANDRUS, Assistant United States Attorney (NY 5143474)
Attorneys for the United States of America
Office of the United States Attorney
111 South Main Street, Suite 1800
Salt Lake City, Utah 84111-2176
(801) 524-5682

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>AARON A. WAGNER, and<br>MICHAEL MAINS,<br><br>Defendants. | Case No. 2:24-cr-357<br><br>**UNITED STATES' NOTICE OF INTENT TO OFFER EXPERT TESTIMONY** |

Pursuant to Fed. R. Crim. P. 16(a)(1)(G) and Rule 702 of the Federal Rules of Evidence, the United States hereby provides notice of the summary and expert testimony of FBI Forensic Accountant Becca Broderick that the United States intends to offer at trial. The United States anticipates Ms. Broderick's testimony will consist primarily of lay testimony summarizing transactional data reflected in bank account records for the defendants and various entities and accounts under their control. Ms. Broderick is well-qualified as an expert in forensic accounting, but no specialized accounting skill is necessary for most of the money tracing testimony that she will offer. Several tracing summaries are attached. The United States believes some, if not all, of

Ms. Broderick's testimony is admissible summary testimony and lay opinion but provides the following disclosure in abundance of caution.[1]

## I. **Ms. Broderick's Testimony will Utilize Summary Exhibits and Illustrative Aids.**

The United States will call FBI Forensic Accountant Becca Broderick as a summary witness to testify and answer questions about summary exhibits pursuant to Fed. R. Evid. 1006 and illustrative aids under Fed. R. Evid. 107. Rule 1006 provides that "[t]he proponent may use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court." Rule 107 allows a party to introduce an illustrative aid "to help the trier of fact understand the evidence or argument," but this aid is not admitted as evidence and does not go back with the jury during deliberations. The United States believes all the attached summaries should qualify as summary exhibits under Rule 1006, but if not admitted, they will be used at trial as Rule 107 illustrative aids.

The proponent of summary evidence under Rule 1006 "must make the originals or duplicates available for examination or copying, or both, by other parties at a reasonable time and place." *Id*. Fed. R. Evid. 1006 allows for the introduction of summary evidence to aid the jury in the examination of testimony or documents in evidence. *See e.g., United States v. Behrens*, 689 F.2d 154, 161-62 (10th Cir.), cert. denied, 459 U.S. 1088 (1982). The proponent of a summary introduced pursuant to Rule 1006 must establish the admissibility of the underlying documents as a condition precedent to introduction of the summary. *United States v. Samaniego*,

[1] The United States believes the disclosures in this notice are greater than required by Rule 16(a)(1)(G) and Rule 702. By providing such detail, the United States is not assuming a burden greater than the rules require, and reserves the right to present any undisclosed testimony that is properly within the scope of Rule 701, as well as any testimony within the scope of Rule 702 that is properly noticed even if not laid out in as great detail as other aspects of this notice. Moreover, the defendant has provided no prior expert disclosures. Therefore, the United States also reserves the right to present any undisclosed Rule 702 testimony that falls within the scope of rebuttal.

187 F.3d 1222, 1223 (10th Cir. 1994). The underlying documents do not have to be admitted, but they must be established as admissible. *Id*. Summaries must fairly represent the underlying documents upon which they are based. *United States v. Conford*, 336 F.2d 285, 287-88 (10th Cir. 1964). The Tenth Circuit has repeatedly approved the use of Rule 1006 summaries, particularly where, as here, the summaries will aid the jury in organizing the information contained in a large number of documents into understandable form. *Swallow v. United States*, 307 F.2d 81, 84 (10th Cir. 1962) (summaries approved in cases involving complicated documentary proof); *Behrens*, 689 F.2d at 161-62. Rule 1006 treats properly admitted summaries as evidence in their own right rather than just presentations of other evidence in a more coherent form, as long as the underlying evidence is admissible. *Samaniego*, 187 F.3d at 1223-24.

Disclosure of a summary witness's anticipated testimony is not required under either the Federal Rules of Criminal Procedure or the Federal Rules of Evidence. Even so, the United States makes this disclosure as a courtesy, expressly reserving its right to revise the subject matter of Ms. Broderick's summary testimony and the proposed summary exhibits. The United States has produced voluminous financial records that are broad in scope and relate to multiple financial accounts. The United States is hopeful to reach a stipulation with defendants as to the admissibility of both the underlying financial records and the summary exhibits.

Ms. Broderick will provide summary testimony regarding the source and disposition of certain funds based upon financial records. Her testimony will be accompanied by various summary charts she prepared to aid her testimony. Her testimony will identify which financial records she relied upon, the source and use of funds, financial links between records, overall summaries of the accounts, and bank balance analyses for specific time periods. Her "testimony [will] rest[] on the personal knowledge [she] gained during the course of [her] examination" of

records obtained in this case. *United States v. Weaver*, 281 F.3d 228, 231 (D.C. Cir. 2002). The fact that she "performed 'routine computations and culling through of documents' to arrive at [her] conclusions [does] not require [her] to be qualified as an expert" for this testimony. *Id*. (*citing United States v. Lemire*, 720 F.2d 1327, 1350 (D.C.Cir.1983)).

## II. <u>Description of Ms. Broderick's Summary Testimony</u>

While expressly reserving its right to revise the subject matter of Ms. Broderick's testimony, the United States anticipates Ms. Broderick may provide summary testimony regarding the following:

1. Ms. Broderick may summarize source and disposition of funds from the key accounts in Attachment 2, which may be broken down by posted date, location, amount, transaction type and/or payor/payee name. Ms. Broderick may also refer to signature cards and other documents used to open the accounts.
2. Ms. Broderick may discuss investors listed on the 2021 and 2022 tax returns and associated investor documentation for Sugar Group X, Kokonut Group X, Cantina Group X, and Bird Group X.
3. Ms. Broderick may summarize and highlight accounts that received investor funds. She may specifically outline the below deposits:
    a. She may provide a list of all deposits equal to or greater than $1,000 for Account X6906 - Kokonut Group X. She may compile the list by source name and list in ascending order by posted date. She may highlight that from when the account was opened on April 29, 2021 through October 26, 2021, Account X6906 – Kokonut Group X received about $5.35M from investors. These investors were identified using tax returns or information provided by

witnesses. Within the outlined period, the only non-investor deposits greater than $1,000 were a transfer from Account X7979 – Wagscap Food Services on May 28, 2021 for $200,000 and a transfer from Account X2305 – Kokonut Island Grill of SLC on July 12, 2021 for $6,000. She may state that the deposit on May 28, 2021 for $200,000 was transferred back to Account X7979 – Wagscap Food Services on the same date for the same amount, effectively reversing the transaction. She may state that from the period of April 29, 2021 through October 26, 2021, excluding the transfer of $200,000 on May 28, 2021, 99.89 percent were from investors.

b. She may provide a list of all deposits equal to or greater than $1,000 for Account X5444 – Bird Group X. She may compile the list by source name and list in ascending order by posted date. She may highlight that from when the account was opened on July 28, 2021 through November 8, 2021, Account X5444 – Bird Group X received about $2.35M from investors. These investors were identified using tax returns. Within the outlined period, the other deposits greater than $1,000 were a deposit from Account X7979 – Wagscap Food Services for $250,000 on August 5, 2021 and a deposit from Account X6906 – Kokonut Group X for $700,000 on September 15, 2021. She may state that on July 22, 2021 there was a deposit into Account X7979 – Wagscap Food Services for $250,000 from a Dirty Bird investor and the balance of Account X7979 – Wagscap Food Service never dropped below $250,000 until $250,000 was transferred to Account X5444 – Bird Group X on August 5, 2021. She may state that essentially all funds transferred from Account X6906 – Kokonut

Group X traced directly to investors as outlined above. She may state that from the period of July 28, 2021 through November 8, 2021, at least 92.4 percent of incoming funds traced to investors (direct deposits into Account X5444 – Bird Group X of $2.35M and a transfer from Account X6906 - Kokonut Group X of $700,000). She may state that it is likely that the $250,000 or remaining 7.6 percent were funds from the investor who deposited funds into Account X7979 – Wagscap Food Services on July 22, 2021.

c. She may provide a list of all deposits equal to or greater than $1,000 for Account X5451 – Sugar Group X. She may compile the list by source name and list in ascending order by posted date. She may highlight that from when the account was opened on July 28, 2021 through March 25, 2022, Account X5451 – Sugar Group X received about $4.96M from investors. These investors were identified using tax returns. Within the outlined period, the only other deposit greater than $1,000 were a deposit from Account X6906 – Kokonut Group X for $850,000 on October 7, 2021 and a deposit from Account X7979 – Wagscap Food Services for $500,000 on December 6, 2021 and a return from Amazon on November 4, 2021 for about $2,141.92. She may state that most funds transferred from Account X6906 – Kokonut Group X traced directly to investors as outlined above. She may state that the December 6, 2021 deposit of $500,000 from Account X7979 – Wagscap Food Services traced back to the refinance of 7323 E Shoeman Lane, Scottsdale, AZ, a property purchased primarily with investor funds . She may state that on December 6, 2021 that $295,000 was transferred back to Account X7979 – Wagscap Food Services,

partially reversing the $500,000 deposit on the same date. She may state that from the period of July 28, 2021 through March 25, 2022, about 99.95 percent of incoming funds traced to investors (direct deposits into Account X5444 – Bird Group X of $4.955M, transfers from Account X6906 - Kokonut Group X of $850,000, and the partially reversed transaction on December 6, 2021 of $205,00 net traced to investor funds).

d. She may provide a list of all deposits equal to or greater than $1,000 for Account X0406 – WCFS Cantina. She may compile the list by source name and list in ascending order by posted date. She may highlight that from when the account was opened on October 13, 2021 through June 27, 2022, Account X0406 – WCFS Cantina received about $2.11M from investors as identified in tax returns and from information provided by witnesses. An additional $100,000 was deposited during the outlined period and has characteristics that make it seem like investor proceeds. Within the outlined period, there were no other deposits greater than $1,000. She may state that from the period of October 13, 2021 through June 27, 2022, at least 95.48 percent of funds were from investors.

4. Ms. Broderick may provide the source and disposition of funds for the transactions below:

   a. Ms. Broderick may describe how on September 3, 2021, Account X7979 – Wagscap Food Services received $400,000 from Account X6906 – Kokonut Group X, $100,000 from Account X5444 – Bird Group X, and $100,000 from Account X5451 – Sugar Group X. On September 3, 2021, Account X7979 – Wagscap Food Services transferred $500,000 to Account X9342 – Dynamic

Capital with a memo line referencing "300000 DISTRIBUTION" and "200000 MANTEL NOVO CONTRIBUTION." On September 7, 2021, Account X7979 – Wagscap Food Services sent $100,000 via Bill.com to Account X8282 – Mantel Capital. Both the transfer to Dynamic Capital and the transfer to Mantel Capital would not have been possible without the deposits from the investor group accounts.

b. Ms. Broderick may describe how on September 30, 2021, Account X7979 – Wagscap Food Service received $166,666.66 from Account X5444 – Bird Group X, $166,666.66 from Account X5451 – Sugar Group X, and $166,666.66 from Account X6906 – Kokonut Group X. A check dated the same date was made out to Anthem Pest Control with a memo line of "Anthem Office Purchase" for $500,000. The check was posted on October 4, 2021. Between September 30, 2021 through October 4, 2021, $31,413.25 was deposited into Account X7979 – Wagscap Food Services from other sources. Considering these deposits and the beginning balance, the check to Anthem Pest Control would not have been possible without the transfers from the investor group accounts.

c. Ms. Broderick may describe how on October 8, 2021, Account X7979 – Wagscap Food Services received $2M from Account X5444 – Bird Group X, $2M from Account X5451 – Sugar Group X, and $330,387.50 from Account X6906 - Kokonut Group X for a total of $4,330,387.50. She may state that those funds were predominately sourced from investors and that on the same date, October 8, 2021, $4,280,387.50 was sent to Grand Canyon Title Agency.

Further, she may state that records provided by the title company identified the transaction as the purchase of a commercial property on 7323 E Shoeman Lane, Scottsdale, AZ. She may state that the purchase would not have been possible without the transfer from the investor group accounts.

d. Ms. Broderick may describe that on October 15, 2021, Account X6906 – Kokonut Group X sent $726,270.55 to Pioneer Title Agency. She may further describe that records obtained from the title company identified that the funds were for the purchase of a home at 11221 N 75th St, Scottsdale, AZ purchased by Mr. Wagner. In addition to the down payment, the house was funded via a loan from Select Portfolio Services. On the loan application under the header, "Section 2: Financial Information – Assets and Liabilities," Ms. Broderick may point out the line item showing an account at US Bank with the last 4 of the account number listed as "6906" and a value of $1,311,348.81. She may correlate this data with Account X6906 – Kokonut Group X and state that the account had a matching balance on August 31, 2021. She may state that the funds represented in the application gave the impression Mr. Wagner had more cash on hand because he represented the Kokonut Group X funds as his own.

e. Ms. Broderick may describe that on November 18, 2021, Account X7979 – Wagscap Food Services received $300,000 from Account X5444 – Bird Group X, $427,715.29 from Account X5451 – Sugar Group X, and $300,000 from Account X6906 - Kokonut Group X for a total of $1,027,715.29. She may state that on the same date, November 18, 2021, $1,027,715.29 was transferred to Account X4329 – The Belle with a memo line of "LOAN TO THE BELLE

LLC." These funds were commingled with other funds in Account 4329 – The Belle and used to purchase a cashier's check for $2,529,180.29 payable to First American Title with a memo line of "HIGGINS RIVERFRONT MISSOULA, MT." The purchase of the property would not have been possible without the transfers from the investor group accounts.

f. Ms. Broderick may state that on November 26, 2021, WFG National Title Insurance wired $3,419,079.00 to Account X9342 – Dynamic Capital and that records obtained for the title company identified the transaction as a refinance of the property on Shoeman Lane in Scottsdale, Arizona. She may state that the initial purchase of the property occurred predominately with investor funds as outlined above. She may state that on November 26, 2021 that Account X9342 – Dynamic Capital transferred $1M to Account X9264 – Wags Capital and that a portion of the funds were used to on November 30, 2021 to send $585,940.15 to Progression Group LLC on December 1, 2021 for the purchase of ownership shares for a Pilatus airplane and hanger. She may state that on December 3, 2021 that another $2M was transferred from Account X9342 – Dynamic Capital to Account X9264 – Wags Capital and that most of those funds traced to the refinance of Shoeman Lane. Account X9264 – Wags Capital used the funds from the refinance of Shoeman Lane to send $286,888.89 to Elevator Studios on December 8, 2021 and $486,944.44 to Volim 910 on December 13, 2021. She may state that on December 3, 2021, Account X9264 – Wags Capital transferred $1.5M to Account X7979 – Wagscap Food Services. From the $1.5M transferred to Account X7979, on December 6, 2021, $500,000 was sent

to each of Account X5444 – Bird Group X, Account X5451 – Sugar Group X, and Account X6906 – Kokonut Group X.

g. Ms. Broderick may state that on December 20, 2021, Account X5451 – Sugar Group X transferred $400,000 to Account X7979 – Wagscap Food Services. On the same date, December 20, 2021, Account X7979 – Wagscap Food Service paid Aero-space Reports $300,000 and Green Paper Capital $100,000. Records from Aero-space Reports identified that both transactions related to the purchase of a CJ4 airplane. These payments would not have been possible without a portion of funds from Account X5451 – Sugar Group X.

h. Ms. Broderick may state that Account X5451 – Sugar Group X transferred $495,000 to Account X7979 – Wagscap Food Services on December 30, 2021. She may state that this transfer was sourced either from investor deposits or from the $500,000 transferred back to Account X5451 – Sugar Group from the Shoeman Lane refinance. On December 30, 2021, $395,000 was transferred to Truck Ranch HQ, a company owned by Mr. Wagner's brother J.W. On the same date $94,790.00 was transferred to Elliott Aviation referencing "N141RT" in the memo line. "N141RT" relates to the CJ4 airplane. Both the transfer to Truck Ranch and to Elliott Aviation would not have been possible without the funds transferred from Account X5451 – Sugar Group X.

i. Ms. Broderick may state that on February 4, 2022, Truck Ranch HQ sent $200K to Account 9342 – Dynamic Capital. These funds were likely associated with the loan given to Truck Ranch in December 2021 that was predominately funded by a transfer from Account X5451 – Sugar Group X. A portion of these

funds were used to pay Mr. Wagner's American Express and send funds to Account X9264 – Wags Capital. Later, most of the funds transferred into Account X9264 – Wags Capital were sent back to Account X9342 – Dynamic Capital where funds were used to make additional payments on American Express, among other things.

j. Ms. Broderick may state that on February 18, 2022, Account X7979 – Wagscap Food Services received $800,000 from Account X5451 – Sugar Group X, $400,000 from Account X0406 – WCFS Cantina, and $300,000 from Account X5444 – Bird Group X. On the same date, February 18, 2022, Account X7979 – Wagscap Food Service paid Aero-Space Reports $1,889,419.75 in two payments for the purchase of a CJ4 airplane. The payments to Aero-space Reports would not be possible without the funds from the investor group accounts.

k. Ms. Broderick may state that on February 24, 2022, Truck Ranch HQ sent $195K to Account X7979 – Wagscap Food Services. These funds may be associated with the loan given to Truck Ranch in December 2021 that was predominately funded by a transfer from Account X5451 – Sugar Group X. From February 24, 2022 through March 11, 2022, the repayment, commingled with other funds, was used to pay for payroll, transfer funds to Kokonut Group X, pay DBB Holdings for the Shoeman Lane loan, transfer funds to Wagner's spouse, among other things. No significant amount of funds was returned to Account X5451 – Sugar Group X from the repayment of the loan.

l. Ms. Broderick may state that on September 13, 2022, Account X7979 – Wagscap Food Services received $100,000 from Account X5451 – Sugar Group X. On the same day, Account X7979 – Wagscap Food Services paid World Fuel Europe $87,309.67 in two transactions with memo lines stating, "WCFS TRAVEL LLC BALANCE." A portion of the funds used to pay the balance traced to investor A.A. Note, between August 23, 2022 and September 12, 2022, Mr. Mains deposited $1M through Jong Tai and an additional $80K through WCFS Travel to Account X7979 – Wagscap Food Services. Some transfers were made to Account X5451 – Sugar Group X during this period. However, when the World Fuel Europe payments were made, the balance in both Account X7979 – Wagscap Food Services and Account X5451 – Sugar Group X were depleted such that the payment would not have been possible without investor funds.

m. Ms. Broderick may state that on November 18, 2022 that J.J. deposited $2.25M into Account X7979 – Wagscap Food Services with the memo listing "DIRTY BIRD." On the same date, funds were sent to multiple accounts. Specifically, a total of $674,500 was sent to Account X0406 – WCFS Cantina where the funds were used to pay $293,548.40 to Mint Construction on November 22, 2022. In the following weeks, a total of $325,109.43 was sent to Davis Ink Limited who, according to records provided, had a project on Las Botellas. On November 21, 2022, M.J.C. (J.J.'s business partner) deposited $750,000 into Account X7979 – Wagscap Food Services. Among other expenditures, $119,470.69 was sent to Account X9342 – Dynamic Capital on November 30, 2022, $128,896.26 was

sent to Account X8282 – Mantel Capital, and $157,719.14 was sent to Sorensen Design and Construction (using records provided by Sorensen Design and Construction this payment was for renovations of the Wagscap Food Service office, Suite 201) on December 2, 2021. From November 18, 2022 through December 16, 2022, about $162,898.90 was deposited from other sources. A detailed summary of use of funds may be provided with posted date, amount, transaction type, category, and/or payee name.

n. Ms. Broderick may state that on December 13, 2022, Account X8573 – Wagscap Food Services received $4,176,380.86 from the sale of the CJ4 airplane. On December 22, 2022, $200,000 was sent to Account X9342 – Dynamic Capital where it was commingled with $500,000 from J.G. Acquisitions LLC who was investing in Valley Grove Retail Center. Some of these funds were used to make payments on credit cards and about $330,000 net was sent between December 22,2022 and January 6, 2022 to Account X9264 – Wags Capital. Between January 6, 2022 and January 10, 2023, in addition to the funds from Account X9342 – Dynamic Capital, Account X9264 – Wags Capital received $3.7M from Account X8573 – Wagscap Food Services, almost exclusively sourced from the sale of the airplane. From the funds sent to Account X9264 – Wags Capital, $358,354.56 was paid to Wagner Leasing, $250,000.00 was paid to Truck Ranch HQ, and $150,000.00 was sent to C.M.W. From January 6, 2023 through January 10, 2023, $3M was sent from Account X9264 – Wags Capital to Account X7979 – Wagscap Food Services. From December 19, 2022 through January 11, 2023, Account X7979 –

Wagscap Food Services transferred $1.9M to Jong Tai (Mr. Mains' company), $535,000 to Account X0406 – WCFS Cantina, $226,150 to Account X6906 – Kokonut Group X, $151,575 to Account X5451 – Sugar Group, $79,500 to Account X5444 – Bird Group X, and other payees. A detailed summary of use of funds may be provided with posted date, amount, transaction type, category, and/or payee name.

o. From February 28, 2023 through March 3, 2023, C.B. (and his affiliates) sent $2,410,145.70 to Account X7979 – Wagscap Food Services for the purchase of the Pilatus plane. When the Shoeman Lane property was refinanced in November 2021, a portion of those funds had been used to purchase stake in the Pilatus airplane. From February 28, 2023 through March 3, 2023, the funds from the sale of the Pilatus airplane, commingled with other funds, were used to send $643,500 to Account X0406 – WCFS Cantina, $494,400 to Account X5444 – Bird Group X, $286,000 to Account X6906 – Kokonut Group X, and other accounts. Note, Account X0406 – WCFS had not provided any funds for the original purchase of Shoeman Lane. A detailed summary of use of funds may be provided with posted date, amount, transaction type, category, and/or payee name.

p. Ms. Broderick may state that on June 7, 2023, SL20 LLC sent Account X7979 – Wagscap Food Service $5,750,250. These funds were sent to various accounts. For example, from June 8, 2023 through July 7, 2023, about $1.12M was sent to Account X5444 – Bird Group X where most of the funds were sent as a $530,148.38 payment to Sorensen Design & Construction for Dirty Bird

store construction and directly to Dirty Bird store accounts for locations in Sandy, Layton, Pleasant Grove, Saratoga, and Ogden. Also, on June 6, 2023, $518,435.96 was paid to Sunnyside Capital who had funded loans for WCFS in the past. On June 13, 2023, $181,090 was sent to Account X9342 - Dynamic Capital. On June 20, 2023, $250,000 was sent to Truck Ranch HQ with a memo line of "SCOTTSDALE SWAGS BUYOUT."

q. Ms. Broderick may state that on September 12, 2023, WFG National Title Insurance sent $200,000 to Account X9326 – Aaron Wagner (and spouse), where it was commingled with other funds. The property being sold was the home at 11221 N 75th St, Scottsdale, AZ that was partially purchased with funds from Kokonut Group X. On September 21, 2023, Account X9326 – Aaron Wagner (and spouse) paid $100,000 to Central Bank for HELOC loan X1531 on Mr. Wagner's main residence at the time at 781 N. Country Manor Lane, Alpine, UT.. On September 28, 2023, Account 9326 – Aagon Wagner (and spouse) paid an additional $100,000 Central Bank for HELOC loan X1531. From September 22, 2023 through September 28,2023, a net amount of $94,935.16 was withdrawn from HELOC X1531 and commingled with other funds into Account X8116 – Wags Capital. On September 28, 2023, Account X8116 – Wags Capital sent $100,000 to Account X4329 – The Belle.

r. Ms. Broderick may state that on October 2, 2023, WFG National Title Insurance sent $830,793.50 to Account X9326 – Aaron Wagner (and spouse) for the sale of the property at 11221 N 7th St, Scottsdale, AZ, a residential home that was partially purchased with funds from Account X6906 – Kokonut Group X in

October 2021. On October 2, 2023, $830,000 of the funds from the house sale were sent to Account X9342 – Dynamic Capital with a memo line "LOAN REPAYMENT FOR HOUSE." On October 3, 2023, Account X9342 – Dynamic Capital received $1M from Mantel Capital (Mr. Mains' company) with memo line of "DEBT REPAYMENT BUSINESS PARTNERS" and $3M from Michael Mains with a memo line of "BUSINESS DEBT PAYMENT BUSINESS PARTNERS" on October 4, 2023. From October 3, 2023 through October 11, 2023, $4,609,471.33 was sent to Account X9264 – Wags Capital. From October 3, 2023 through October 11, 2023, using the funds from Mr. Mains and the sale of the Scottsdale house, $597,386.55 was paid to Truck Ranch HQ and $3,509,471.33 was paid to DBB Holdings with a memo line stating, "Shoeman Lane Payoff." A detailed summary of use of funds for the above accounts may be provided with posted date, amount, transaction type, category, and/or payee name.

5. Ms. Broderick may discuss and tally transfers to and from accounts controlled by Mr. Mains and Mr. Wagner to Wagscap Food Services. Specifically, she may describe how Mr. Mains predominantly sent and received funds from Mantel Capital and Jong Tai USA. Mr. Wagner predominantly sent and received funds from Wags Capital, Dynamic Capital, and Wagscap. He occasionally received funds via a direct payment to his American Express credit card, payments to Wagner's spouse, and funds sent to Account X9326 – Aaron Wagner (and spouse). She may testify that the transfers to and from Mr. Wagner and his affiliates are not consistent with a substantial capital

contribution by Mr. Wagner net of any distributions, no less a capital contribution of $20 million or more.

## III. Expert Witness Disclosure

Rule 16(a)(1)(G) of the Federal Rules of Criminal Procedure requires that, at the defendant's request, the government disclose the information required under Rule 16(a)(1)(G)(iii) for any testimony the government intends use at trial under in its case-in-chief or rebuttal under Federal Rules of Evidence 702, 703, or 705. *See* Fed. R. Crim. P. 16(a)(1)(G)(i). The disclosure must contain (1) a complete statement of all opinions that the government will elicit from the witness in its case-in-chief, or during its rebuttal to counter testimony that the defendant has disclosed under Fed. R. Crim. P. 16(b)(1)(C), (2) the bases and reasons for them, (3) the witnesses qualifications, including a list of all publications authored in the previous 10 years, and (4) a list of all other cases in the prior 4 years where the witness has testified as an expert at trial or by deposition.

Rule 702 of the Federal Rules of Evidence provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

The Committee Note to the Rule explains that "if the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts [of the case]."

Ms. Broderick is a Certified Public Accountant ("CPA") and a Certified Fraud Examiner ("CFE"). Since July 2023, Ms. Broderick has been employed by the Federal Bureau of Investigation ("FBI") as a Forensic Accountant. In her role, she has experience in reviewing, compiling, and examining financial data, reporting her findings, and preparing summary charts. She has been primarily engaged in complex white-collar criminal investigations, including investigations involving investment fraud, loan fraud, embezzlement, and money laundering. Prior to her employment at the FBI, Ms. Broderick worked for an accounting firm in their advisory practice where she performed work related to audit readiness and remediation, financial analytics, and business process improvement. Ms. Broderick's qualifications are set forth in detail in the resume attached in Attachment 1. Ms. Broderick has not previously testified as an expert witness.

At trial, Ms. Broderick will testify regarding the source and disposition of funds that flowed through the financial accounts and transactions in this matter. She will also describe certain accounting concepts and interpret bank documentation. These opinions will provide context and help the jury understand the nature of the transactions, financial records, and summary exhibits, including:

1. <u>Accounting methods such as the proportional method, Last-In First-Out (LIFO), and First-In First-Out (FIFO)</u>. A description of an applied accounting methodology may be relevant when Ms. Broderick's testimony discusses tracing deposits into outflows of funds. For many of the transactions, the balances within a given bank account prior to the date of deposit were low, which thereby allows Ms. Broderick to directly trace a given deposit into subsequent withdrawal(s). In such cases, accounting methods are generally not relevant. When there is a sizable balance prior to a given deposit or if the deposit is commingled with other deposits on the same day, Ms. Broderick may rely

on the proportional method, LIFO, or FIFO to explain proportion of source funds within a given withdrawal. The United States may also ask Ms. Broderick to describe how she made determinations about the nature or source of incoming funds as well as determinations about the destination and classification of outgoing funds.

2. Financial Statements, Accounting Records, and Basic Tax Principals and Definitions: Ms. Broderick may discuss accounting principles, to include examining income statements and balance sheets and the line items listed therein for the following entities: Wagscap Food Services, Bird Group X, Sugar Group X, Kokonut Group X, and Cantina Group X. She may further discuss how the income statement and balance sheet information can translate into cash flows. Specifically, her testimony may include the definition of concepts such as revenue, net income, operating income, expenses, assets, intangible assets, liabilities, payables, and owner's equity. In addition, she may discuss the differences in accrual accounting, tax accounting, and cash accounting.

3. Ms. Broderick may also discuss tax records and documents, to include examining specific line items therein relating to the following entities: Wagscap Food Services, Bird Group X, Sugar Group X, Kokonut Group X, Cantina Group X. Specifically, she may discuss line items on the 1065 return, ordinary income (loss), distributions, and book income versus tax income.

4. She may describe the following examples and numbers associated with tax returns for 2021 and 2022:

    a. The 2021 tax returns for Bird Group X, Sugar Group X, and Kokonut Group X show Wagscap Food Services contributed millions in capital contributions. The records show that the contributions were recorded for each entity as a

journal entry where Goodwill was debited and Equity WCFS Contributions was credited. This journal entry did not represent an infusion of cash.

b. From the accounting records and tax records of 2021 and 2022, Ms. Broderick analyzed the cash flow for Kokonut Group X, Sugar Group X, and Bird Group X. She specifically may discuss investor contributions, spending on acquisition, building, and operations, loans to Wagscap Food Services, and the net remaining cash available for acquisition, building, and operation of stores in the future. She may further discuss the number of stores operating based on the information provided in the tax returns.

c. For 2021, Ms. Broderick may testify that investors in Kokonut Group X, Sugar Group X, and Bird Group X contributed about $13.6M. She may testify that about $1.8M was spent on acquisition, building, and operations expenses in excess of gross receipts across the three investment groups in 2021. This category includes line items associated with the purchase of existing stores, payments to build or remodel stores, and funds used to operate stores once they were opened. Further, the records showed that Kokonut Group X, Bird Group X, and Sugar Group X, in aggregate, loaned about $9.3M to Wagscap Food Services in 2021. As of December 31, 2021, the three X investment groups reported a remaining cash balance of about $2.4M. In addition, the tax returns show that as of the end of 2021, only 3 stores were operating and generating revenue with an additional 5 stores with assets placed into service.

d. For 2022, Ms. Broderick identified that investors in Kokonut Group X, Sugar Group X, and Bird Group X contributed about $1.1M in 2022. She determined

that about $5.6M in 2022 was spent on acquisition, building, and operations expenses in excess of gross receipts across the two investment groups. This category includes potential purchases of an existing store, payments to build or remodel stores, and funds used to operate the store once it was opened. Further, the records showed that Kokonut Group X and Sugar Group X, in aggregate, received about $2.3M from Wagscap Food Services, significantly less than the funds loaned in 2021. As of the end of December 31, 2022, the investment groups only reported a remaining cash balance of about $174K. In addition, the tax returns show that as of the end of 2022, only 9 stores were operating and generating revenue with an additional 1 store with assets placed into service.

e. When taking the cumulative cash flow of 2021 and 2022, Ms. Broderick may state that about $14.7M was contributed by investors. The stores had an overall loss and would not be able to provided cash to for the further development or acquisiton of stores. At the end of 2022, Wagscap Food Services reported an outstanding loan balance of $7.1M to the X group accounts and had only repaid about 25 percent of the loan from the previous year.

5. Ms. Broderick may describe the activity of Wagscap Food Services and associated accounts between 2019 through 2023. Specifically, she may discuss activity associated with the following accounts: Account X0406 – WCFS Cantina, Account X2320 – WCFS Electric Fish, Account X2353 – WCFS Morning After PG, Account X3227 – Cantina Group X, Account X3722 – Wagscap Food Services, Account X5444 – Bird Group X, Account X5451 - Sugar Group X, Account X6906 – Kokonut Group X, Account X7979 – Wagscap Food Services,

Account X8504 – Wagscap Food Services, and Account X8573 – Wagscap Food Services. She may discuss the below:

a. Ms. Broderick may state that from 2019 through 2021, about $17.4M net was sourced from investors and lenders. During the same time period, about $4.4M net was spent on transactions related to payroll, construction, restaurant supply, services, rent, among other things. About $11.9M net was spent on activities not associated with purchasing, building, and operating restaurants. Instead, funds were used to transfer funds to Mr. Wagner, Mr. Mains, and Mr. Wagner's brother J.W. Also, funds were used for construction on the Wagner Business Center, purchase of the Shoeman Lane property, purchase of a house in Scottsdale, purchase of a property in Missoula (Higgins Riverfront), payments towards a CJ4 plane, and payments associated with a Pilatus plane.

b. Ms. Broderick may describe that from 2022 through 2023, an additional $12.6M net was collected from investors and lenders. About $896K net was deposited from other WCFS accounts. A number of assets purchased in the previous year were sold resulting, with other transfers, in $3.1M being returned to the above accounts. The funds from the above sources were predominately used for payroll, construction, restaurant supply, services, rent, among other things.

c. Ms. Broderick may describe the cumulative impact of all the activity from 2019 through 2023. About $30.1M net was deposited from investors and lenders. About $1.5M net was sourced from investor group accounts, restaurants, and other WCFS accounts. From the $31.6M net sourced from activity associated

with investors or investor-related activities, $22.7M net (about 72 percent of net deposits) was spent on transactions for payroll, construction, restaurant supply, services, rent, among other things. About $8.8M net (about 28 percent of net deposits) was used for transfers to Mr. Wagner, transfers to Mr. Mains, transfers to J.W., construction on the Wagner Business Center, purchase of Shoeman Lane, purchase of a house in Scottsdale, purchase of a property in Missoula (Higgins Riverfront), purchase and use of a CJ4 plane, and transactions related to a Pilatus plane. Although many of these assets were sold and some funds were returned to Wagscap Food Services and its subsidiary accounts, most of these transactions had a net negative financial impact on Wagscap Food Services and its subsidiaries.

6. Ms. Broderick may provide analysis of the comparative financial statements included with the tax return records provided by Cooper Norman for Wagscap Food Services. She may specifically discuss the analysis below:

   a. On the 2021 comparative balance sheet, about half of Wagscap Food Service's assets in 2021 were loans to other entities, such as store entities, Dynamic Capital, Truck Ranch, etc. Loan receivable valuations and classifications are heavily dependent on the ability and willingness of the borrower to repay the loan in the future. These loans were identified as current assets indicating that these loans were expected to be repaid within 12 months. On the following year's comparative balance sheet (2022), most of these loans increased or stayed about the same. Many of these entities were related parties or store entities where Wagscap Food Services, Mr. Wagner, and/or Mr. Mains would

have insight into the likelihood of repayment. In addition, Wagscap Food Services, Mr. Wagner, and Mr. Mains were in a position of control or influence where they could decide or influence the repayment of loans. As many of these loans stayed the same or increased the next year, it appears that entities may not have sufficient cash flow to make repayments or delayed payments past the initial 12 months of the loan. These factors lead to the conclusion that the loans may have been or were likely to be bad debts (and not true assets) or that these loans were not short-term loans but rather long-term loans..

7. <u>Business Entity Structure and Ownership</u>: Ms. Broderick may discuss the business structure of Wagscap Food Service, Sugar Group X, Kokonut Group X, Bird Group X, and Cantina Group X including parent and subsidiary companies. She may discuss that Wagscap Food Services was owned by parent companies Dynamic Capital (Mr. Wagner's business) and Mantel Capital (Mr. Mains' business). She may further describe how Wagscap Food Services had ownership in many of the restaurant-related entities. She may describe how partnerships report owner interests and how those ownerships interest may change. She may discuss how parent companies and subsidiaries interact such as in the instance of intercompany transfers and loans, and related parties. Specifically, she may describe the below ownership structures:
    a. Wagscap Food Services was initially owned equally by Mantel Capital and Dynamic Capital. As years progressed, some ownership shares in Wagscap Food Services were sold, but Mantel Capital and Dynamic Capital had majority ownership from inception in 2019 to at least the end of 2022.

b. Wagscap Food Services held over 50 percent ownership in Sugar Group X, Bird Group X, Kokonut Group X, Cantina Group X from, at least, 2021 through 2022. Wagscap Food Services also had ownership interests in several individual store entities.

DATED: July 31, 2026.

Respectfully submitted,

MELISSA HOLYOAK
United States Attorney

*/s/Carl D. LeSueur*
CARL D. LESUEUR
BRENT L. ANDRUS
Assistant United States Attorneys

**Witness Approval and Signature**

Pursuant to Rule 16(a)(1)(G)(v), Ms. Broderick has reviewed and approved this filing. Furthermore, she has electronically signed this filing below:

/s/*Becca Broderick* [signed with permission]

Becca Broderick