MELISSA HOLYOAK, United States Attorney (#9832)
CARL D. LESUEUR, Assistant United States Attorney (#16087)
BRENT L. ANDRUS, Assistant United States Attorney (NY 5143474)
Attorneys for the United States of America
Office of the United States Attorney
111 South Main Street, Suite 1800
Salt Lake City, Utah 84111-2176
(801) 524-5682

---

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>AARON A. WAGNER, and<br>MICHAEL MAINS,<br><br>Defendants. | Case No. 2:24-cr-357<br><br>**UNITED STATES' MOTION IN LIMINE TO ADMIT EVIDENCE OF EACH CHARGED OFFENSE IN ANY TRIAL OF THE OTHERS** |

The Defendants have moved to sever one trial into three: one trial on counts 1 to 4, one on counts 5 and 6, and another on counts 7 and 8. In the event trial on any counts is severed, the United States moves to admit evidence of each offense as intrinsic evidence of the others, and alternatively as evidence admissible for proper purposes under Rule 404(b).

*Each of the Charges Is Intrinsic Evidence of the Others*

Counts 2, 3, and 5 each charge a conspiracy involving both Wagner and Mains during overlapping periods. (Counts 1, 4 and 6 are substantive wire fraud or money laundering counts arising from those conspiracies). Each conspiracy helps establish the illicit nature of their relationship and demonstrates they trusted the other to engage in each conspiracy. Each conspiracy overlaps the others in time and evidence. Accordingly, they are inextricably

intertwined and intrinsic evidence of the other. Counts 7 and 8 are alleged against Wagner only, but arise from the same overarching scheme to raise money from investors and divert it to themselves. The conduct in each offense involves the same a similar scheme overlapping in time, involving some of the same victims (and attempted victims), and involving some of the same methods and transaction participants as counts 1 through 6.

The government has "considerable leeway in offering evidence of other offenses in conspiracy prosecutions." *United States v. Parker*, 469 F. 2d 884, 894 (10th Cir. 1972). Often those offenses are intrinsic evidence. Indications that other acts are intrinsic evidence of charged conduct include when they: (i) are inextricably intertwined with the conspiracy, (ii) occur within the same time frame, (iii) were a necessary preliminary to the charged conspiracy, (iv) provide direct proof of the defendant's involvement in the conspiracy, (v) are germane background, directly connected to the factual circumstances of the conspiracy, (vii) or provide background and context of the nature of the defendant's relationship to his coconspirator. *United States v. Cushing*, 10 F. 4th 1055, 1075-76 (10th Cir. 2021).[1] Each of these applies to each of the offenses here.

Wagner hatched a scheme to enrich himself at the expense of his investors through fraud. Each of the charges in Counts 1 through 8 arise from that scheme, and Mains's joinder in that scheme. In 2020 and early 2021, Wagner fraudulently secured advances on a construction loan at a retail center. Wagner used the loan advances for personal enrichment, such as building a pool

---

[1] *United States v. Irving*, 665 F. 3d 1184, 1212 (10th Cir. 2011) (evidence intrinsic to conspiracy "when the evidence of the other act and the evidence of the crime charged are inextricably intertwined or both acts are part of a single criminal episode or the other acts were necessary preliminaries to the crime charged"); *United States v. Portillo-Quezada*, 469 F. 3d 1345, 1353 (10th Cir. 2006) (other crimes committed in furtherance of a conspiracy are also themselves part of the charged conspiracy); *United States v. Mathis*, 216 F. 3d 18, 26 (D.C. Cir. 2000) *quoting United States v. Williams*, 205 F. 3d 23, 33-34 (2d Cir. 2000) (intrinsic conspiracy evidence includes "background of the conspiracy charged . . . and [evidence] to help explain to the jury how the illegal relationship between the participants in the crime developed").

house at his home. This conduct gives rise to the bank fraud and money laundering charges in Counts 7 and 8. The fraudulent loan advances not only placed the bank at risk, they also increased the bank lien on the retail center to the detriment of Wagner's investors. Wagner's efforts at fraudulent construction invoicing continued until at least March 2022.[2]

While that fraud was ongoing, Mains joined Wagner's scheme to defraud investors. Together, they began eliciting investments in restaurant entities, including one developing ten Kokonut Island Grill restaurants through an entity called Kokonut Group X. They agreed to misrepresent the amount of money they intended to use to develop the restaurants. They provided the investors an inflated number, with the intent of pocketing the excess to enrich themselves. That excess they referred to as a capital "over raise."[3] They eventually began using the investor funds without regard to how much was needed to develop the restaurants.[4] The fraud against these and other restaurant investors are alleged in Counts 1 to 4.

One of the ways they used the restaurant investors money was to pursue real estate investments, including a $4.2 million real estate investment on Shoeman Lane in Scottsdale Arizona. This same property plays a key role in the fake debt fraud conspiracy alleged in Counts 5 and 6. Given the illicit trust Wagner and Mains had developed in each other, they agreed to help each other shield assets from potential creditors. They manufactured a fictitious debt Mains would owe to Wagner, so that no one else – including Mains's spouse – could make a claim on Mains's assets. After purchasing the Shoeman Lane with restaurant investors' money, Wagner

---

[2] *See, e.g.,* Ex. 24 (Wagner's March 28, 2022 email to contractor requesting that he prepare an invoice to extract remaining available loan draws, in excess of actual construction costs).

[3] *See, e.g.,* Ex. 57 (Mains' February 26, 2021 email to Wagner proposing that they could use the "over raise" to build a restaurant in Bountiful just for him and Wagner and keep the investors out of it); Ex. 3 (Mains directing payment on the jet); Ex. 72 (Mains proposing to Wagner that they use "over raise" to pay $1.5 million downpayment on jet).

[4] Many of these expenditures were described in the resignation letter of their CFO. Ex. 61. They had used the funds to pay for two private aircraft, a hangar, a $90,000 watch, a second home for Wagner, commercial real estate investments in Scottsdale, Arizona and Missoula, Montana, and to pay business obligations connected to Everbowl restaurants. In the six months from August 2021 to February 2022 alone, they spent more than $6.5 million of restaurant investors money on items other than developing the restaurants.

and Mains took out a loan of approximately $4 million on that property. During Mains's divorce, Mains sent Wagner $4 million, which Wagner used to pay off that loan. They claimed in the divorce that Mains owed Wagner $20 million for lending Mains money to contribute to the restaurant business. They claimed the $4 million was a payment on that loan. In truth, no such loan was ever extended. Instead, Wagner agreed to repay Mains the $4 million after the divorce by selling the Shoeman Lan property. That property was, as set forth above, represented proceeds of the restaurant investment fraud.

As set forth above, the bank fraud is a preliminary to the restaurant investor fraud, which is a preliminary to the money laundering, which is a preliminary to the fake debt fraud involving Shoeman Lane. Each conspiracy tends to prove the illicit trust that Wagner and Mains held in one another, so that each conspiracy tends to prove their knowing and voluntary agreement to commit the others. Each overlaps in time and evidence. The agreement to divert investor funds to their own purposes was occurring at the same time as the bank fraud and involved the same investors. The Shoeman Lane property was purchased with fraud proceeds in October 2021, and they attempted to convert that to cash for Michael Mains in or around October 2024. It appears that the fake debt fraud was conjured sometime between those dates, and involved the same property. Some of the crimes were more for Wagner's benefit, and others more for Mains. But together, they demonstrate a "rub-my-back and I'll rub yours" arrangement between the two of them. Each of the offenses—and their coordinate efforts in them—helps demonstrate why Mains would trust Wagner that he could loan Wagner $4 million during his divorce with confidence that Wagner would not record or disclose the loan, but would still return the money after the divorce.

*If Extrinsic, Each of the Offenses Would be Admissible for Proper Purposes under Rule 404(b)*

Even if each were not intrinsic to the others, each offense would be admissible under Rule 404(b) in the trial of the others. The Tenth Circuit requires consideration of four factors in weighing the admissibility of evidence under Rule 404(b): (1) whether the evidence is offered for a proper purpose, (2) its relevancy, (3) that the probative value of the evidence is not substantially outweighed by its prejudicial effect, and (4) a limiting instruction is given if the defendant so requests. *United States v. Mares*, 441 F.3d 1152, 1156 (10th Cir. 2006) *citing Huddleston v. United States*, 485 U.S. 681 (1988). Evidence of other crimes or acts may arise from conduct that occurs before or after the charged offense. *Mares*, 441 F. 3d at 1156. Evidence of other acts "is particularly relevant when a defendant's intent is at issue." *Id.*

Wagner's use of faked invoices to extract money from the retail center through fraudulent debt (Counts 7 and 8) would be relevant in trial about Wagner's and Mains's efforts to extract money from the restaurant investors through fraud as alleged in Counts 1 to 4 (and vice versa). The evidence serves the proper purpose of demonstrating Wagner's knowledge, intent, absence of mistake, and lack of accident in defrauding his investors. He engaged in the same state of mind relative to his investors in the retail center and to the investors in the restaurants. And some of the investors are the same. The conduct overlapped in time. He used the fraudulently obtained funds for similarly extravagant lifestyle purposes: for instance, building a luxurious pool house and purchasing a second home. Giving this evidence the maximum probative value, the evidence is not unduly prejudicial and does not present reason to convict on an improper basis. *United States v. Henthorn*, 864 F. 3d 1241, 1256 (10th Cir. 2017) (district courts must "give the evidence its maximum reasonable probative force and its minimum reasonable prejudicial value"). A critical element of the offenses is intent to defraud, and all of this conduct is relevant to

establishing that intent. In that sense, it is prejudicial, but not *unfairly* prejudicial. *United States v. Tan*, 254 F. 3d 1204, 1207 (10th Cir. 2001) (unfair prejudice "means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.").

Similarly, Wagner's and Mains's fraud and money laundering (Counts 1 to 4) against the restaurant investors would be relevant in the fake debt conspiracy (Counts 5 and 6), and vice versa, for the proper purpose of demonstrating intent and knowledge, rebutting claims of innocent intent, and providing necessary context to the origins and destination of the property involved. Mains's contradictory explanations of the $4 million transaction before and after the divorce (a payment on a loan from Wagner vs. a loan to Wagner) tends to show the required intent both for the money laundering conspiracy charged in Counts 3 and 4, and the fake debt conspiracy charged in Counts 5 and 6. Their attempt to advance the Shoeman Lane sale proceeds to Michael Mains after the divorce similarly shows the intent to conceal the origin and destination of the funds relevant to both Counts 3 and 4 and Counts 5 and 6. Likewise, the manner in which Wagner and Mains used the property to obtain a loan to Wagscap, but used the proceeds to benefit various other entities and purposes, shows their manner of operation: using various entities to obfuscate the true ownership of various assets. That is relevant to show opportunity and modus operandi in the allegations that Wagner and Mains faked debts between their entities (Counts 5 and 6) in order to shield Mains's assets, and the money laundering charges (Counts 3 and 4). It also tends to show knowledge and intent and absence of mistake or accident, given the similarity of operation and nearness in time. They are sufficiently similar that one set of offenses is unlikely to evoke an emotional reaction causing the jury to convict on the other or some other kind of prejudice.

If trials are severed and if the court finds that any of the offenses is not intrinsic evidence of the others, the United States does not object to an appropriate limiting instruction in each of the trials.

CONCLUSION

Evidence of each charged offenses is intrinsic evidence of the others. Even if it were extrinsic, the evidence would be admissible for proper purposes of showing opportunity, modus operandi, intent, knowledge, lack of accident or mistake.

Respectfully submitted,

DATED: August 7, 2026

MELISSA HOLYOAK
United States Attorney


*/s/Carl D. LeSueur*
CARL D. LESUEUR
BRENT L. ANDRUS
Assistant United States Attorneys