FILED IN UNITED STATES DISTRICT COURT, DISTRICT OF UTAH

AUG 26 2026

GARY P. SERDAR
CLERK OF COURT

BY _______________
DEPUTY CLERK

MELISSA HOLYOAK, United States Attorney (#9832)
CARL D. LESUEUR, Assistant United States Attorney (#16087)
Attorneys for the United States of America
Office of the United States Attorney
111 South Main Street, Suite 1800
Salt Lake City, Utah 84111-2176
Telephone: (801) 524-5682

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>AARON WAGNER,<br><br>Defendant. | Case No. 2:24cr357<br><br>STATEMENT BY DEFENDANT IN ADVANCE OF PLEA OF GUILTY AND PLEA AGREEMENT PURSUANT TO FED. R. CRIM. P. 11(c)(1)(C)<br><br>Judge Ted Stewart |

I hereby acknowledge and certify that I have been advised of and that I understand the following facts and rights, and that I have had the assistance of counsel in reviewing, explaining, and entering into this agreement:

1. As part of this agreement with the United States of America, I intend to plead guilty to three Counts of the Superseding Indictment. My attorney has explained the nature of the charges against me, and I have had an opportunity to discuss the nature of the charges with my attorney. I understand the charges and what the United States is required to prove to convict me.

The elements of Count 3, Conspiracy to Commit Money Laundering are:

> *First*: the defendant agreed with at least one other person to engage in monetary transactions involving at least $10,000 in property derived from criminal activity;
>
> *Second*: the defendant knew the essential objective of the conspiracy.

*Third*: the defendant knowingly and voluntarily participated in the conspiracy.

*Fourth*: there was interdependence among the members of the conspiracy; that is, the members, in some way or manner, intended to act together for their shared mutual benefit within the scope of the conspiracy charged.

The government would have to prove the object of the conspiracy in Count 3 was to commit money laundering in violation of 18 U.S.C. § 1957. The elements of money laundering in violation of 18 U.S.C. § 1957 are:

*First*: the defendant engaged or attempted to engage in a monetary transaction in the United States;

*Second*: that defendant knew the transaction involved criminally derived property;

*Third*: the property involved in the transaction had a value greater than $10,000; and

*Fourth*: At least $10,000 of the property value was derived from wire fraud in violation of 18 U.S.C. § 1343.

The elements of Count 6, Conspiracy to Commit Wire Fraud are:

*First*: the defendant agreed with at least one other person to commit wire fraud;

*Second*: the defendant knew the essential objective of the conspiracy;

*Third*: the defendant knowingly and voluntarily participated in the conspiracy; and

*Fourth*: there was interdependence among the members of the conspiracy; that is, the members, in some way or manner, intended to act together for their shared mutual benefit within the scope of the conspiracy charged.

The government would have to prove object of the conspiracy in Count 6 was to commit wire fraud. The elements of wire fraud are:

*First*: the defendant devised or intended to devise a scheme to defraud, as alleged in the indictment;

*Second*: the defendant acted with specific intent to defraud;

*Third*: the defendant used interstate or foreign wire communications facilities, or caused another person to use interstate or foreign wire communications facilities for the purpose of carrying out the scheme;

*Fourth*: the scheme employed false or fraudulent pretenses, representations, or promises that were material.

The elements of Count 7, Bank Fraud are:

*First*: the defendant knowingly executed a scheme or artifice to defraud Central Bank through means of false or fraudulent pretenses;

*Second*: Central Bank was a financial institution within the meaning of the law; in this case that means that the government must prove that Central Bank was insured by the Federal Deposit Insurance Corporation;

*Third*: the defendant acted with intent to defraud Central Bank; and

*Fourth*: the false or fraudulent pretenses, representations, or promises that the defendant made were material, meaning they would naturally tend to influence, or were capable of influencing the decision of, Central Bank.

*Fifth*: the defendant placed Central Bank at risk of civil liability or financial loss.

2. I know that the maximum possible penalty provided by law for Count 3 of the Superseding Indictment, a violation of 18 U.S.C. § 1956(h), is a term of imprisonment of 10 years, a fine of $250,000, a term of supervised release of three years, and any applicable forfeiture.

I know that the maximum possible penalty provided by law for Count 6 of the Superseding Indictment, a violation of 18 U.S.C. § 1349, is a term of imprisonment of 20 years, a fine of $250,000, a term of supervised release of three years, and any applicable forfeiture.

I know that the maximum possible penalty provided by law for Count 7 of the Superseding Indictment, a violation of 18 U.S.C. § 1344, is a term of imprisonment of 30 years, a fine of $1,000,000, a term of supervised release of five years, and any applicable forfeiture.

I understand that if I violate a term or condition of supervised release, I can be returned to prison for the length of time provided in 18 U.S.C. § 3583(e)(3).

a. Additionally, I know the Court is required to impose an assessment in the amount of $100 for each offense of conviction, pursuant to 18 U.S.C. § 3013. Furthermore, restitution to the victims of my offenses shall be ordered pursuant to 18 U.S.C. § 3663A.

b. I understand that, if I am not a United States citizen, I may be removed from the United States, denied citizenship, and denied admission to the United States in the future. I understand that if the count to which I am pleading is an aggravated felony, my removal/deportation will be presumptively mandatory. I have fully discussed these consequences with my lawyer, including the likelihood that the count to which I am pleading is an aggravated felony.

3. I know that the sentencing procedures in this case and the ultimate sentence will be determined pursuant to 18 U.S.C. § 3553(a), and that the Court must consider, but is not bound by, the United States Sentencing Guidelines, in determining my sentence. I have discussed these procedures with my attorney. I also know that the final calculation of my sentence by the Court may differ from any calculation the United States, my attorney, or I may have made, and I will not be able to withdraw my plea if this occurs.

4. I know that I can be represented by an attorney at every stage of the proceeding, and I know that if I cannot afford an attorney, one will be appointed to represent me.

5. I know that I have a right to plead "Not Guilty" or maintain my earlier plea of "Not Guilty" and can have a trial on the charges against me.

6. I know that I have a right to a trial by jury, and I know that if I stand trial by a jury:

a. I have a right to the assistance of counsel at every stage of the proceeding.

b. I have a right to see and observe the witnesses who testify against me.

c. My attorney can cross-examine all witnesses who testify against me.

d. I have the right to testify and present evidence, to call witnesses to testify at trial, and I can obtain subpoenas to require the attendance and testimony of those witnesses. If I cannot afford to pay for the appearance of a witness and mileage fees, the United States will pay them.

e. I cannot be forced to incriminate myself, and I do not have to testify at any trial.

f. If I do not want to testify, the jury will be told that no inference adverse to me may be drawn from my election not to testify.

g. The United States must prove each and every element of the offense charged against me beyond a reasonable doubt.

h. It requires a unanimous verdict of a jury to convict me.

i. If I were to be convicted, I could appeal, and if I could not afford to appeal, the United States would pay the costs of the appeal, including the services of appointed counsel.

7. If I plead guilty, I will not have a trial of any kind.

8. I know that 18 U.S.C. § 3742(a) sets forth the circumstances under which I may appeal my sentence. However, fully understanding my right to appeal my sentence, and in consideration of the concessions and/or commitments made by the United States in this plea agreement, I knowingly, voluntarily and expressly waive my right to appeal as set forth in paragraph 12 below.

9. I know that 18 U.S.C. § 3742(b) sets forth the circumstances under which the United States may appeal my sentence.

10. I know that under a plea of guilty the judge may ask me questions under oath about the offense. The questions, if asked on the record and in the presence of counsel, must be answered truthfully and, if I give false answers, I can be prosecuted for perjury.

11. I stipulate and agree that the following facts accurately describe my conduct. These facts provide a basis for the Court to accept my guilty plea:

***Bank Fraud Against Central Bank***

Beginning in or around October 2020 and continuing until at least February 2021, I devised a scheme to defraud Central Bank for the purposes of obtaining money and

property. Specifically, I requested that the contractor who was building a retail center in Pleasant Grove for my business prepare falsified invoices in order to obtain construction loan advances from Central Bank. The invoices falsely purported to reflect costs of improvements on the retail center, but I knew the costs reflected were actually for improvements of my home and for other uses unrelated to the retail property. The extra indebtedness caused the bank a risk of financial loss and civil litigation.

I used the proceeds of the bank fraud to, among other things, pay: (1) $221,412.89 for improvements to my then-residence at 781 N. Country Manor Lane; (2) $64,552.21 for improvements to an area of the property at 4421 North Thanksgiving Way, Lehi, UT 84043 referred to as the "man cave," (the property is a commercial property I owned through an entity); and (3) $50,000 toward debt accrued on an American Express card ending in x14005. After my indictment, the property was sold and Central Bank was paid in full with interest for these loans, but the people to whom I had sold interests in the property owner lost money.

***Conspiracy to Commit Money Laundering of Proceeds of Wire Fraud against Restaurant Investors***

Beginning at least as early as February 2021, I knowingly and intentionally agreed with Michael Mains to use false statements and misrepresentations to solicit investments in our restaurant businesses, operated through Wagscap Food Services LLC and affiliates. We solicited investments in a number of affiliates, each organized to develop restaurants under different restaurant brands. Among other things, we agreed we would overstate the development costs in order to induce excess investment proceeds. We agreed to split the excess raised funds – which we internally referred to as a capital "over raise" – between Michael Mains and me.

We knowingly made other misrepresentations to investors as well, such as deceptively representing the number of restaurants we had opened in 12 months, falsely representing the brands' performance history, and misrepresenting the experience and existing operations of Wagscap Food Services, the business that would oversee the development of the restaurants.

With these misrepresentations, we raised the following approximate amounts through the following entities:

- $4,055,000 for Kokonut Group X;
- $4,565,000 for Bird Group X;
- $5,425,000 for Sugar Group X; and
- $3,710,000 for Cantina Group X.

Mains and I both relied on each other to fulfill complementary roles in our conspiracy. For instance, Mains was primarily responsible for supervising everyday operations and overseeing finances and staff, while I was primarily responsible for preparing the pitch decks and presenting the pitches to investors. I acknowledge that the conduct described above reflects a conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349.

We knowingly and intentionally agreed to engage in transactions using at least $10,000 of the proceeds of that conspiracy to acquire ownership interests in a variety of assets. We knew and intended that the transactions would conceal from investors and from subsequent purchasers the fact we had received the funds from restaurant investors. We relied upon each other to fulfill different roles regarding these transactions. For example, Mains was primarily responsible for overseeing the day-to-day business operations and finances. But I was primarily responsible for identifying and developing opportunities for us to deploy the proceeds. I acknowledge that conspiracy is a violation of 18 U.S.C. § 1956(h).

In furtherance of that conspiracy, almost immediately after receiving investor funds in the scheme, we began using the funds to purchase and acquire assets the investors had no legal ownership interest in. These include more than $8 million spent between October 2021 and February 2022 in the transactions that follow, each involving more than $10,000 of the fraud proceeds:

(1) a property at 7323 East Shoeman Lane, Scottsdale, Arizona (titled to Wagscap LLC) by wiring downpayments totaling $4,330,387.50 to Grand Canyon Title from Wagscap Food Services (using funds from Sugar Group X, Bird Group X, and Kokonut Group X) (this property was ultimately sold for $4,811,152.19, which the government seized and I admit is entirely traceable to the conspiracy);

(2) a property at 11221 N. 75th Street, Scottsdale, Arizona 85260 with an October 15, 2021 wire of $726,270.55 from Kokonut Group X to Pioneer Title Agency, Inc. as a downpayment on purchasing a $3,650,000 home;

(3) a $2,162,742.17 preferred equity interest for Wagscap LLC in the Belle LLC, owner of real estate property at 500 South Higgins Avenue in Missoula, Montana. That interest was funded by wire transfers from Sugar Group X, Bird Group X, and Kokonut Group X through Wagscap Food Services and then to The Belle through a November 8, 2021 wire of $1,027,715.29. I used my position at the Belle LLC to use these funds to make a downpayment toward purchasing the Higgins property for a total of $8,300,000;

(4) ownership units in Crows Nest UT LLC (an entity owning a hangar and a Pilatus aircraft) for WCFS Travel LLC by wiring $585,940.15 to C.B.'s entity on December 1, 2021;

(5) an Audemars Piguet watch using funds secured by refinancing the Shoeman Lane property to wire $90,000 to Gentleman Timepieces on December 2, 2021;

(6) a Citation CJ4 aircraft by wiring in four transactions totaling $2,289,419.75 (and each transaction involving more than $10,000 of proceeds from the fraud) to the prior owner and title company on December 20, 2021 and February 18, 2022 as downpayment on a $9,350,000 purchase of the private jet;

I also acknowledge that, on September 21 and 28, 2023, I used proceeds of the sale of the Scottsdale residence identified above to send two wires of $100,000 each to pay the mortgage on the property at 781 North Country Manor Lane, Alpine Utah, so that it became property involved in the conspiracy.

Investors eventually began questioning why we hadn't built more restaurants in a timely manner with their money. We raised additional money from new investors in an effort to develop the original investors' expected restaurants. We did not disclose to the new investors what we had done with prior investors' money, or that we intended to use new investors' money to pay for prior investors' projects or to pay them off.

For example, in seeking convertible loans from J.J. and M.C., we told them we anticipated their money would be used to develop four new Dirty Bird restaurants. I presented a pitchdeck projecting that the Dirty Bird restaurants would earn $40,825 per month in profits, achieving an internal rate of return of 39% per year for J.J. and M.C. We also indicated it was a "proven concept in high growth mode" that would yield "immediate earnings, profitability and distributions." But we knew at the time that our few operating Dirty Bird restaurants were unprofitable on average, and even the ones that made any profit did not generate anywhere near the size returns in the projections we gave J.J. and M.C. We also knew that we actually intended to use some of the loan proceeds to develop other restaurants that we were already committed to develop for other investors. Based upon our misleading representations, J.J. and M.C. extended convertible loans totaling approximately $3,000,000.

In seeking further investment from SL20, we told the family that owned that business that Wagscap Food Services LLC had a proven track record of profitability and quarterly investor distributions. In fact, Wagscap Food Services was unprofitable, borrowing from investors in other entities to cover its payroll and operations. While Mains and I received dividends from Wagscap Food Services, the dividends were often funded by taking "intercompany" loans from funds investors invested in other entities. In

fact, we intended to use the money SL20 invested to pay back unsatisfied investors in these other companies. Based upon our misrepresentations and omissions, SL20 invested approximately $5,750,250 in Wagscap Food Services LLC.

***Conspiracy to Falsify Debts in Order to Protect Mains's Assets***

While business partners in Wagscap Food Services, Mains and I knowingly and intentionally agreed to devise a scheme where we would create a series of loan documents in order to make it appear that Mains owed me money for investing capital in Wagscap Food Services on his behalf. The purpose of the fraud was to protect his assets from his creditors or his wife. The documents Mains created, and our communications to divorce counsel and Mains's wife, suggested that I had advanced $20.5 million in capital on Mains's behalf, which created a lien against all his assets. Mains also tried to convince her through our documents and communications that I intended to enforce the debt. But I knew I never loaned the money or expected repayment. I knew no indebtedness really existed. And I did not intend to enforce the claimed liability or debt. As part of the scheme, the $4 million he had previously sent me during the divorce, we could claim as a payment of the fake debt. In truth, however, we intended that I would pay off the loan on the Shoeman Lane property and recognize him as the substituted lender and, after the divorce was final, we would refinance or sell the property and pay Mains back from the proceeds. It was part of the conspiracy that we would send emails via interstate wires to advance the conspiracy. I acknowledge that the purpose of this scheme was to secure and conceal money and property for Mains in the divorce proceeding. We relied upon each other in the scheme in that Mains was solely responsible for communications with his wife, while I presented documents to Mains's attorney to corroborate the fake debt.

12. The only terms and conditions pertaining to this plea agreement between me and the United States are as follows:

a. **Guilty Plea.** I will plead guilty to three Counts: Counts 3, 6, and 7 of the Superseding Indictment.

b. **Stipulated Sentence.** Pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure, the sentence of imprisonment imposed by the Court will be 120 months' imprisonment, which I agree is a reasonable sentence.

(1) I understand that this agreement, including my plea, the agreed upon sentence, and all other terms referenced herein, are subject to the approval of, and acceptance by the Court. I further understand that the Court will likely order the preparation of a Presentence Report to assist in the determination of whether this plea and

the agreement are appropriate, and I agree to fully cooperate in the preparation of the Presentence Report.

(2) If, after receiving all relevant information, the Court rejects the plea agreement and determines that a sentence different from the agreed upon sentence of 120 months will be imposed, I will have the right to withdraw the plea of guilty and the terms of this agreement will become null and void. Likewise, if the Court rejects the plea agreement and determines that the sentence should be less than 120 months, I understand that the United States will have the right to move to vacate this agreement, and all terms of this agreement will become null and void.

c. **Dismissal of Counts.** The United States agrees to move for leave to dismiss Counts 1-2, 4-5, and 8 at the time of sentencing.

d. **Relevant Conduct.** I understand and agree that the Presentence Report may include descriptions of conduct I engaged in which either was not charged against me, will not be pleaded to by me, or both. I understand and agree that the Court may take these facts into consideration in sentencing.

e. **Acceptance of Responsibility**. The United States agrees to recommend that my offense level under the U.S. Sentencing Guidelines be decreased by two levels for acceptance of responsibility pursuant to Sentencing Guideline § 3E1.1(a) if, in the opinion of the United States, I clearly demonstrate acceptance of responsibility for my offenses, up to and including at the time of sentencing, as set forth in § 3E1.1 of the Sentencing Guidelines. In addition, the United States agrees to move for an additional one-level reduction in the offense level, in accordance with Sentencing Guideline § 3E1.1(b), if I qualify for a two-level reduction under § 3E1.1(a) and the offense level is 16 or greater prior to receiving the two-level reduction.

f. **Appeal Waiver.**

(1) Fully understanding my limited right to appeal my sentence, as explained above in paragraph 8, and in consideration of the concessions and/or commitments made by the United States in this plea agreement, I knowingly, voluntarily, and expressly waive my right to appeal any sentence imposed upon me, and the manner in which the sentence is determined, on any of the grounds set forth in 18 U.S.C. § 3742 or on any ground whatever, including any sentence imposed upon a revocation of supervised release or probation, except I do not waive my right to appeal as set forth in 18 U.S.C. § 3742(c)(1), which states that I may not file a notice of appeal unless the sentence imposed is greater than the sentence set forth in this agreement. I also knowingly, voluntarily, and expressly waive any argument (1) that the statute(s) to which

I am pleading guilty is/are unconstitutional or (2) that my admitted conduct does not fall within the scope of the statute(s).

(2) I also knowingly, voluntarily, and expressly waive my right to challenge my sentence, and the manner in which the sentence is determined, and my conviction, in any collateral review motion, writ or other procedure, including but not limited to a motion brought under 28 U.S.C. § 2255, except on the issue of ineffective assistance of counsel. This waiver includes any motion for modification of my sentence under 18 U.S.C. § 3582(c)(2).

(3) I understand that this waiver of my appeal and collateral review rights concerning my sentence shall not affect the United States' right to appeal my sentence pursuant to18 U.S.C. § 3742(b).

(4) I further understand and agree that the word "sentence" appearing throughout this waiver provision is being used broadly and applies to all aspects of the Court's sentencing authority, including, but not limited to: (1) sentencing determinations; (2) the imposition of imprisonment, fines, supervised release, probation, and any specific terms and conditions thereof; and (3) any orders of restitution.

g. **Rule 410 Waiver.** If the Court finds that I failed to fulfill my obligations under this plea agreement, or if I withdraw my plea of guilty (for reasons other than the Court rejecting this 11(c)(1)(C) agreement), I agree that this agreement, my statements pursuant to this agreement, or any leads derived therefrom, shall be admissible at any trial, hearing, or other proceeding.

h. **Presentence Report and Financial Information.** I agree to provide truthful and complete information, including financial information, as requested by the probation office for the preparation of my presentence report and for determination of the conditions of my supervised release. I also consent to allowing the United States Attorney's Office to run a credit check on me. I consent to being placed on the Treasury Offset Program and State Finder.

i. **Financial Enforcement and Collection.** I agree that any fine, forfeiture, or restitution imposed by the Court against me will be due and payable immediately and subject to the immediate enforcement by the government as authorized by 18 U.S.C. § 3613. I further understand that the government may seek immediate collection of the entire fine, forfeiture, or restitution from any assets without regard to any schedule of payments imposed by the Court or established by the probation office and that monetary penalties imposed by the Court will be submitted to the Treasury Offset Program and State Finder so that any federal payment or transfer of returned property I receive may be

offset and applied to federal debts in addition to and above amounts set forth in any payment plan.

j. **Restitution.**

(1) I agree that I am subject to mandatory restitution because my case falls within the provisions of 18 U.S.C. § 3663A(a)(1) and (c)(1) based on an offense described in § 3663A(c)(1) that gave rise to this plea agreement. My attorney has explained what mandatory restitution means. I also agree to pay restitution to victims of unpleaded or uncharged relevant conduct pursuant to 18 U.S.C. § 3663A(a)(3).

(2) I understand that the amount of restitution and the schedule of payments will be determined as a part of the sentencing proceedings in accordance with the provisions of 18 U.S.C. § 3664. I agree to pay all restitution as ordered by the Court. I agree that the payment and enforcement of my restitution order is governed by 18 U.S.C. § 3664, and my lawyer has explained the consequences of an order of restitution.

(3) I understand and agree that payment of any restitution owed, pursuant to the schedule set by the Court at sentencing, should be a condition of any term of probation or supervised release imposed upon me. I know that if I fail to pay restitution as ordered, the failure can be considered a violation of probation or supervised release and, pursuant to 18 U.S.C. § 3614, the Court can resentence me to any sentence which might originally have been imposed in my case.

(4) The United States Attorney's Office agrees to seek approval from the Department of Justice to apply the money and items forfeited towards payment of restitution to the victims, but cannot bind the Department of Justice.

k. **Waiver of Interest.** The United States agrees to recommend that the Court waive interest for fines and restitution assessed against me.

l. **Forfeiture.**

(1) I agree to the administrative, civil, or criminal forfeiture to the United States of any property noted as subject to forfeiture in the indictment, information, bills of particulars, or seized or restrained in the investigation underlying the indictment or information, and will not contest, challenge, or appeal in any way such forfeiture, including the forfeiture of:

- $1,227,715 as a substitute res for a $2,162,742.17 equity with preference by Wagscap LLC and a $27,715.29 bridge loan by Wagscap Food Services

LLC, related to an investment by The Belle, LLC in a real property at 500 South Higgins Avenue in Missoula, Montana (titled to The Belle, LLC);

- An October 12, 2021 promissory note for $750,000 between Mantel Capital LLC and the Belle LLC and the associated debt and ownership interests;
- $421,412.89 of $1,274,727.66 in proceeds of sale being held by the U.S. Marshals Service for forfeiture in lieu of real property at 781 North Country Manor Lane, Alpine, Utah (titled to Aaron A. Wagner and Candace Wagner);
- $4,811,152.19 in proceeds of the sale of a real property at 7323 East Shoeman Lane, Scottsdale, Arizona (titled to Wagscap LLC);
- All funds and holdings in account ending x5900 at Wells Fargo Advisors for accountholder Michael J. Mains;
- All holdings in an Arvest Bank account ending in x6329 for North Woods Developers LLC and any related promissory note or indebtedness to Michael Mains or his affiliates for a loan for the benefit of North Woods Developers LLC used to fund certificate of deposit account;
- Real property (consisting of a lot of approximately 5.59 acres) at N. Walton Blvd, Bentonville Arkansas 72736-1095 (Parcel Number 01-05221-000) (titled to North Woods Developers LLC) and any related promissory note or indebtedness to Michael Mains or his affiliates for a loan for the benefit of North Woods Developers LLC to purchase the property;
- Real property at 963 N. Sunset Dr., Washington, Utah (titled to Sunset Company 963 LLC);
- Real property at 3078 North 880 East, Lehi, Utah (titled to Michael Mains);
- Real Property at 1281 W Tuono Place, Lehi, Utah (titled to Mantel Capital LLC);
- Real Property at 11272 Normandy Way, Highland, Utah (titled to Michael Mains);
- A 2015 Lamborghini Huracan, Black Color, VIN# ZHWUC1ZF3FLA03238 (titled to Mantel Marketing LLC);
- A 2016 Corvette, Black Color, Coupe Style, VIN# 1G1YK2D70G5125103 (titled to Michael J. Mains); and
- $50,000.00 as a substitute res for a 2023 Porsche 911 Carrera, VIN: WP0AB2A98PS221156.

(2) I acknowledge that this property is subject to forfeiture under 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), 18 U.S.C. § 982(a)(2)(A) and 18 U.S.C. § 982(a)(1).

(3) I acknowledge that the United States is entitled to a forfeiture money judgment equal to the value of property that facilitated, was involved in, or that I

obtained from my offense that is not available for forfeiture under the forfeiture authorities listed above. I understand that the exact amount of the forfeiture money judgment is still to be determined. I further agree that substitute property may be forfeited pursuant to 21 U.S.C. § 853(p) when property subject to forfeiture is unavailable for one or more of the reasons set forth below. Specifically,, I agree that, excluding the property listed in Paragraph 12.l.(1), other property subject to forfeiture: 1) cannot be located upon the exercise of due diligence; 2) has been transferred or sold to, or deposited with, a third party; 3) has been placed beyond the court's jurisdiction; 4) has been substantially diminished in value; or 5) has been commingled with other property which cannot be divided without difficulty as provided by 21 U.S.C. § 853(p). I further agree that the value of the property listed in Paragraph 12.l.(4), does not exceed the value of property that facilitated, was involved in, or that I obtained from my offense that is not available for forfeiture under the forfeiture authorities listed above.

(4) I agree to forfeit the following property as a substitute asset pursuant to 21 U.S.C. § 853(p):

a. $35,151.62 of the proceeds from the sale of a Cirrus SR22 aircraft with serial number 1333 and tail number N1052A (these funds represent the proceeds owed to Aaron Wagner as a 50% owner of Wagscap Leasing LLC);
b. $102,943.90 in funds from the sale of real property at 856 West Antelope Drive, Clearfield, Utah (titled to WCFS Properties, LLC);
c. $64,170 in proceeds from the sale of the Crumbl Cookie Franchise owed to Mantel Capital LLC;
d. $50,889.60 in proceeds from the sale of a Crumbl Cookie Franchise owed to Dynamic Capital, LLC;
e. $129,116.69 in proceeds from the sale of a Crumbl Cookie Franchise owed to Wagscap Food Services, LLC "Beaverton, OR";
f. $147,297.86 in proceeds from the sale of a Crumbl Cookie Franchise owed to Wagscap Food Services, LLC "Southlake, TX";
g. $13,763.30 in proceeds from sale of a Crumbl Cookie Franchise owed to Wagscap Food Services, LLC "Vancouver, WA";
h. $2,648.50 from checking account of closed Dirty Bird restaurant in Pleasant Grove, Utah, managed by Wagscap Food Services, LLC;
i. $152,741.24 in proceeds from the sale of property located at 678 South Pleasant Grove Blvd., Pleasant Grove, Utah (Mall property);
j. $2,682.91 from checking account of closed Dirty Bird restaurant in Sandy, Utah, managed by Wagscap Food Services, LLC;
k. $23,110.12 from Wagscap Food Services, LLC of Beaverton, OR, Ceder Hills LLC dba Crumbl of Beaverton;

l. $2,773.93 from Wagscap Food Services, LLC of Lehi, UT Traverse LLC dba Crumbl of Lehi;
m. $4,296.83 from Wagscap Food Services of Flagstaff, AZ, Regent Street LLC; and
n. 11,187.27 from Wagscap Food Services of South Services of South Lake, TX Blvd LLC.

(5) I consent to entry of any orders, judgments, or declarations of forfeiture regarding such property and waive the requirements (including notice of the forfeiture) of 19 U.S.C. §§ 1607-1609; 18 U.S.C. §§ 981, 983, and 985; the Code of Federal Regulations; and Rules 11 and 32.2 of the Federal Rules of Criminal Procedure. I consent to any criminal forfeiture order becoming final as to me upon its entry.

(6) I will not claim the property or oppose its forfeiture, nor help anyone else do so, and will testify truthfully in any forfeiture proceeding. As far as I know, no other third party has an interest in the property. I withdraw any previous administrative forfeiture claims and petitions for remission related to the property. I will not claim property sought for forfeiture from other defendants related to my case. I will sign any documents necessary to ensure that clear title to the property passes to the United States.

(7) I waive any claims I may have against the government, its officers, employees, and agents regarding the seizure, forfeiture, storage, and disposal of the property.

(8) I waive any constitutional or statutory challenges to the forfeiture, including that it is an excessive fine or punishment.

m. **Self-Surrender**. I understand that I may move the Court to remain out-of-custody pending sentencing hearing and that I may request at sentencing to be allowed to self-surrender to the Bureau of Prisons. The United States acknowledges that it is currently unaware of any instances of noncompliance with my conditions of pretrial release other than a brief interaction with a witness and that Mr. Wagner has not attempted to flee. Based on that information, the United States does not anticipate objecting to my motion to remain out-of-custody or my request to self-surrender.

13. I understand and agree that this plea agreement is solely between me and the United States Attorney for the District of Utah and does not bind any other federal, state, or local prosecuting, administrative, or regulatory authorities.

14. I understand that I have a right to ask the Court any questions I wish to ask concerning my rights about these proceedings and the plea.

* * * *

I make the following representations to the Court:

1. I am 44 years of age. My education consists of Some college. I ____________ [can/cannot] read and understand English.

2. This Statement in Advance contains all terms of the agreements between me and the United States; if there are exceptions, the Court will be specifically advised, on the record, at the time of my guilty plea of the additional terms. I understand the United States and I cannot have terms of this plea agreement that are not disclosed to the Court.

3. No one has made threats, promises, or representations to me that have caused me to plead guilty, other than the provisions set forth in this agreement.

4. Neither my attorney nor the United States has promised me that I would receive probation or any other form of leniency because of my plea.

5. I have discussed this case and this plea with my lawyer as much as I wish, and I have no additional questions.

6. I am satisfied with my lawyer.

7. My decision to enter this plea was made after full and careful thought; with the advice of counsel; and with a full understanding of my rights, the facts and circumstances of the case and the consequences of the plea. I was not under the influence of any drugs, medication, or intoxicants when I made the decision to enter the plea, and I am not now under the influence of any drugs, medication, or intoxicants.

8. I have no mental reservations concerning the plea.

//

//

//

9. I understand and agree to all the above. I know that I am free to change or delete anything contained in this statement. I do not wish to make changes to this agreement because I agree with the terms and all the statements are correct.

DATED this 26th day of August, 2026.

AARON WAGNER
Defendant

I certify that I have discussed this plea agreement with the defendant, that I have fully explained his rights to him, and that I have assisted him in completing this written agreement. I believe that he is knowingly and voluntarily entering the plea with full knowledge of his legal rights and that there is a factual basis for the plea.

DATED this 26th day of August, 2026.

RICHARD VAN WAGONER
Attorney for Defendant

I represent that all terms of the plea agreement between the defendant and the United States have been, or will be at the plea hearing, disclosed to the Court, and there are no undisclosed agreements between the defendant and the United States.

DATED this 20th day of August, 2026.

MELISSA HOLYOAK
United States Attorney

CARL D. LESUEUR
Assistant United States Attorney

**Business Entity Agreement to Forfeiture**

I have reviewed Paragraph 12.1 above regarding the forfeiture of various properties including:

- $4,811,152.19 in proceeds of the sale of a real property at 7323 East Shoeman Lane, Scottsdale, Arizona (titled to Wagscap LLC);
- $1,227,715 as a substitute res for a $2,162,742.17 equity with preference by Wagscap LLC and a $27,715.29 bridge loan by Wagscap Food Services LLC, related to an investment by The Belle, LLC in a real property at 500 South Higgins Avenue in Missoula, Montana (titled to The Belle, LLC);
- $50,889.60 in proceeds from the sale of a Crumbl Cookie Franchise owed to Dynamic Capital, LLC;
- $129,116.69 in proceeds from the sale of a Crumbl Cookie Franchise owed to Wagscap Food Services, LLC "Beaverton, OR" [WAGSCAP FOOD SERVICES OF BEAVERTON OR, CEDAR HILLS LLC];
- $147,297.86 in proceeds from the sale of a Crumbl Cookie Franchise owed to Wagscap Food Services, LLC "Southlake, TX" [WAGSCAP FOOD SERVICES OF SOUTH LAKE, TX BLVD LLC];
- $13,763.30 in proceeds from sale of a Crumbl Cookie Franchise owed to Wagscap Food Services, LLC "Vancouver, WA";
- $2,648.50 from checking account of closed Dirty Bird restaurant in Pleasant Grove, Utah, managed by Wagscap Food Services, LLC;
- $152,741.24 in proceeds from the sale of property located at 678 South Pleasant Grove Blvd., Pleasant Grove, Utah [Dynamic Capital, LLC was on title];
- $2,682.91 from checking account of closed Dirty Bird restaurant in Sandy, Utah, managed by Wagscap Food Services, LLC;
- $23,110.12 from Wagscap Food Services, LLC of Beaverton, OR, Ceder Hills LLC dba Crumbl of Beaverton;
- $2,773.93 from Wagscap Food Services, LLC of Lehi, UT Traverse LLC dba Crumbl of Lehi;
- $4,296.83 from Wagscap Food Services of Flagstaff, AZ, Regent Street LLC; and;
- $11,187.27 from Wagscap Food Services of South Lake, TX Blvd LLC

On behalf of the company, I agree to the forfeiture of this property and to all the terms specified in Paragraph Twelve. I fully understand the provisions in Paragraph Twelve

and voluntarily agree to them on behalf of the company and with full authority to do so.

________________________ 8/26/26
Aaron Wagner Date
Manager, Wagscap LLC
A Utah LLC

________________________ 8/26/26
Dynamic Capital, LLC Date
Manager of
Wagscap Food Services, LLC
A Utah LLC
By: Aaron Wagner, Manager of
Dynamic Capital, LLC
(Wagscap Food Services, LLC is the manager for all the above Crumbl-related entities)

________________________ 8/26/26
Aaron Wagner Date
Manager, Dynamic Capital, LLC
A Utah LLC